**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Rickie Lee BOATWRIGHT,
Defendant-Appellant.**

No. 85–1361.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 11, 1987.

·Decided July 20, 1987.

Nancy L. Simpson, Sacramento, Cal., for plaintiff-appellee.

Sandra Gillies, Sacramento, Cal., and J. Toney, Woodland, Cal., for defendant-appellant.

Before KOELSCH, WALLACE and KENNEDY, Circuit Judges.

KENNEDY, Circuit Judge:

The sole issue in the appeal from a firearms conviction under 26 U.S.C. § 5861(d) is whether two shotguns seized in an illegal search are admissible under the inevitable discovery doctrine, an exception to the exclusionary rule.

In an early stage of the appeal, the government deemed the case controlled by a footnote in *United States v. Echegoyen,* 799 F.2d 1271 (9th Cir.1986), and joined appellant in seeking summary reversal of his conviction. A motions panel of the court decided, however, that oral argument was necessary and ordered supplemental briefing on the inevitable discovery issue. We now conclude that the evidence is not admissible, though for reasons somewhat different from those advanced by the government in support of its earlier motion for summary reversal.

The appellant, Rickie Boatwright, whose guilt would be conclusive if the shotguns were admissible evidence, was something of a bystander in what began as a routine probation investigation of his brother, Rocky Boatwright. Rocky was on probation for the manufacture of methamphetamines and was subject to involuntary search by terms of his probation agreement. Learning that Rocky had moved to Paradise, California, a probation officer from Rocky's home county requested Paradise police to accompany him to Rocky's residence at 1024 Maple Drive to interview him, conduct a search, and learn of his activities.

When the officers arrived, they saw that close by the residence was a detached, smaller structure that was once a garage, with the address 1024A Maple Drive. Also present was a trailer, attached neither to the main residence at 1024 nor to the converted garage at 1024A. The record does not establish precise distances between the three structures, but indicates they were in close proximity.

When the officers called for Rocky, he emerged from the converted garage at 1024A and began to lead them toward the main residence. A strong chemical odor surrounded Rocky, but none of the officers had the expertise or training to identify the odor as one associated with the manufacture of drugs.

Before proceeding to the main residence, the officers decided to enter 1024A because the same odor surrounding Rocky was also emanating from the converted garage. Upon entering, the officers saw a partial laboratory on a bench and behind it a closed door. They went outside, asked Rocky if anyone else was in 1024A, reentered, opened the rear door, and discovered a small room with a bed where Rickie Boatwright was stacking items on top of two sawed-off shotguns. They seized the guns and arrested Rickie on the weapons charges now before us.

Immediately after the seizure and the arrest, there ensued a lawful probation search of the main house occupied by Rocky, a search which disclosed documents relating to the purchase of chemicals, pamphlets and notebooks on drug formulas, and ammunition. A search of the trailer followed, revealing an operating meth-

amphetamine lab. On discovering the lab, the officers notified officials of the Drug Enforcement Administration. Special agent Gregory, an expert in drug manufacture, responded to their call.

It is Gregory's testimony that is the foundation for the inevitable discovery theory. His affidavit states that, based on what the officers discovered in the house and the trailer next door, he would have secured a search warrant for 1024A. On the basis of this affidavit, the government argues that the shotguns would have been discovered as soon as the search warrant was executed; in other words, what in fact was discovered first would have been discovered last, in a more ordered scheme of things, and inevitably so. We cannot accept this argument.

At the outset, however, we reject the restriction on the inevitable discovery doctrine offered by the appellant. He asserts that the doctrine applies only if two independent investigations or searches were in progress, one of which was lawful and would have uncovered the information. In support of this proposition, he cites a footnote in *United States v. Echegoyen*, 799 F.2d 1271 (9th Cir.1986), which states in relevant part:

> Although [the inevitable discovery] exception to the exclusionary rule has been recognized in this circuit, [citations omitted], it has no application to the facts of this case. In *Nix*, police officers discovered the location and condition of the victim's body through an unlawful interrogation of the defendant. The *Nix* court, nonetheless, upheld the admissibility of this evidence because it concluded that an independent ground search simultaneously conducted by the police would have inevitably discovered the evidence. *Nix* [*v. Williams* ], 467 U.S. [431] at 449–50, 104 S.Ct. [2501] at 2512–13 [81 L.Ed.2d 377]. In this case, however, there were not two independent investigations or searches in progress; there was but one continuous investigation. The *Nix* holding is, therefore, inapplicable to this case. Moreover, to excuse the failure to obtain a warrant merely because the officers had probable cause

> and could have inevitably obtained a warrant would completely obviate the warrant requirement of the fourth amendment.

*Id.* at 1280 n. 7.

The requirement that two independent searches be in progress is dictum, as the case admits the challenged evidence. More importantly, the requirement is inconsistent with the teachings of cases before and after *Echegoyen*. *See United States v. Merriweather*, 777 F.2d 503 (9th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1497, 89 L.Ed.2d 898 (1986) (evidence admissible because later search lawful); *United States v. Andrade*, 784 F.2d 1431 (9th Cir. 1986) (evidence admissible because lawful inventory search likely); *United States v. Martinez-Gallegos*, 807 F.2d 868 (9th Cir. 1987) (evidence admissible because lawful examination of files likely). And, though the existence of two independent inquiries in progress comports with the facts of *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the rationale of *Nix* is not so limited.

■ There will be instances where, based on the historical facts, inevitability is demonstrated in such a compelling way that operation of the exclusionary rule is a mechanical and entirely unrealistic bar, preventing the trier of fact from learning what would have come to light in any case. In such cases, the inevitable discovery doctrine will permit introduction of the evidence, whether or not two independent investigations were in progress. The existence of two independent investigations at the time of discovery is not, therefore, a necessary predicate to the inevitable discovery exception.

■ The facts of this case do not justify a comprehensive definition of inevitable discovery. The doctrine is best developed on a case by case basis. We do discern, however, an element that should be shown in most, if not every, case to which the doctrine pertains. Absent some overriding considerations not now apparent to us, the doctrine requires that the fact or likelihood that makes the discovery inevitable arise

from circumstances other than those disclosed by the illegal search itself.

 Here the guns were unlawfully seized and no independent basis for discovery was established. Unlike cases in which an independent search was underway, as in *Nix*, or in which a search would have occurred as a matter of routine procedure, as in *Andrade* and *Martinez-Gallegos*, in this case no independent search occurred or was likely to occur at any point. There is nothing outside the unlawful search itself that points to the inevitable discovery of weapons in control of this defendant. Applying the inevitable discovery doctrine here would, therefore, permit the government to ignore search requirements at any convenient point in the investigation, and would go well beyond the present scope of the doctrine. This we decline to do.

 We note also that, as a factual matter, the assumption that the officers would have found Rickie with the shotguns after searching the principal residence, detaining the probationer Rocky, and waiting for a hypothetical warrant, is most unrealistic. Rickie would not have waited patiently beside his weapons for an agent to arrive with a warrant. As a factual matter, then, as well as a theoretical one, the evidence cannot be admitted under the doctrine of inevitable discovery.

 Before we leave Paradise, it may be useful to explain why the evidence is not admissible under some other theory. It might seem that the probationer, Rocky, had sufficient custody and control over 1024A so that search was permitted under terms of the probation agreement. The trial court's findings, however, were that the structures were separate, and are fairly interpreted to show that Rickie, who paid rent for the detached structure, exercised control exclusive of any control by Rocky. The government, accordingly, did not advance this as a ground for admitting the evidence. Nor did the government argue that entry was lawful because a crime was in progress or because the officers needed to protect themselves while searching the main residence. As the only theory relied upon by the government at trial or on appeal was inevitable discovery, a doctrine not applicable in the circumstances of this case, the conviction must be REVERSED.