2003 UT 30

**STATE of Utah, Plaintiff, Respondent, and Cross–Petitioner,**

v.

**Pearl TOPANOTES, Defendant, Petitioner, and Cross–Respondent.**

**No. 20010127.**

Supreme Court of Utah.

Aug. 22, 2003.

Mark L. Shurtleff, Att'y Gen., Marian Decker, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Linda M. Jones, Ralph W. Dellapiana, Salt Lake City, for defendant.

WILKINS, Justice.

¶ 1 Pearl Topanotes ("Topanotes"), petitioner, seeks certiorari review of a court of appeals' decision wherein the trial court's denial of her motion to suppress evidence obtained after an unlawful detention was reversed and the case remanded for further proceedings. The remand order allowed new evidence on the issue of inevitable discovery, which was raised by the State as an alternative ground for affirmance for the first time on appeal. The State cross-petitions, arguing that remand is unnecessary because inevitable discovery is sustained by the record in this case. We vacate and remand for proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 On October 7, 1998, two Salt Lake City police officers, Sergeant Kenneth Hansen and Officer Todd Mitchell, were visiting the home of a recently arrested prostitute in an attempt to confirm her actual residence. While they were there, the officers saw Topanotes walking toward the trailer. Since Topanotes fit the description of someone who allegedly lived in the home, the officers stopped her and asked for identification. At that moment, the officers did not have an articulable suspicion that Topanotes had or was about to commit a crime, or probable cause sufficient for an arrest. Topanotes gave Sergeant Hansen her identification, and Sergeant Hansen handed it directly to Officer Mitchell to perform a warrants check as part of "routine procedure" or "common practice." Officer Mitchell retained possession of Topanotes' identification during the warrants check.

¶ 3 While waiting for the results of the warrants check, Sergeant Hansen attempted to confirm with Topanotes the actual residence of the prostitute they had just arrested. Sergeant Hansen later testified that if Topanotes had refused to talk to him, he would have ended the encounter. The warrants check was completed within five minutes and revealed two outstanding warrants for Topanotes, who was immediately arrested. The officers discovered heroin on her person during the search incident to her arrest, and subsequently charged Topanotes with unlawful possession of a controlled substance, a third degree felony.

¶ 4 At trial, Topanotes moved to suppress the heroin on the basis that the substance was the fruit of an unlawful level-two detention. The trial court held two evidentiary hearings on the matter and ultimately denied the motion to suppress, ruling that the officers were engaged at all times in a consensual level-one investigatory encounter with Topanotes. After the denial of her motion to suppress, Topanotes entered a conditional

guilty plea, reserving her right to appeal the trial court's ruling.

¶ 5 While the appeal was pending, the Utah Court of Appeals held in a separate case that retaining an individual's identification while conducting a warrants check, in the absence of an articulable suspicion or probable cause, is an unlawful level-two detention. *Salt Lake City v. Ray*, 2000 UT App 55, ¶ 17, 998 P.2d 274.

¶ 6 In light of *Ray*, the State in this case conceded on appeal that the trial court erred in its ruling. Instead, the State argued for the first time a new, alternative ground for affirmance: that the heroin was admissible under the inevitable discovery exception to the exclusionary rule. The court of appeals reversed the trial court's ruling and remanded for additional factual findings on the issue of inevitable discovery.

¶ 7 We granted Topanotes' petition for certiorari. On certiorari, Topanotes argues that the court of appeals erred when it remanded for further factual findings rather than resolving the alternative ground for affirmance based on the record before it. The State argues that remand was appropriate, and on cross-appeal asserts that remand would not be necessary because the record supports application of the inevitable discovery exception to the exclusionary rule in this case.

## ANALYSIS

### I. STANDARD OF REVIEW

¶ 8 "On certiorari, we review the decision of the court of appeals, not the . . . trial court." *State v. James*, 2000 UT 80, ¶ 8, 13 P.3d 576. We review for correctness, granting no deference to the court of appeals' conclusions of law. *Id.*

### II. PROPRIETY OF THE COURT OF APPEALS' REMAND ORDER

¶ 9 Topanotes' first argument is that the court of appeals was required to resolve the issue of inevitable discovery on the existing record because it was an alternative ground for affirmance raised first on appeal.

It is well settled that an appellate court may affirm the judgment appealed from "if it is sustainable on any legal ground or theory apparent on the record, even though such ground or theory differs from that stated by the trial court to be the basis of its ruling or action, and this is true even though such ground or theory is not urged or argued on appeal by appellee, was not raised in the lower court, and was not considered or passed on by the lower court."

*Bailey v. Bayles*, 2002 UT 58, ¶ 10, 52 P.3d 1158 (quoting *Dipoma v. McPhie*, 2001 UT 61, ¶ 18, 29 P.3d 1225) (additional citations omitted); *see also Orton v. Carter*, 970 P.2d 1254, 1260 (Utah 1998); *Limb v. Federated Milk Producers Ass'n*, 23 Utah 2d 222, 225–26 n. 2, 461 P.2d 290, 293 n. 2 (1969); 5 C.J.S. *Appeal & Error* § 714 (1993). However, not only must the alternative ground be apparent on the record, it must also be sustainable by the factual findings of the trial court. "[T]he court of appeals must then determine whether the facts as found by the trial court are sufficient to sustain the decision of the trial court on the alternate ground." *Bailey*, 2002 UT 58 at ¶ 20, 52 P.3d 1158; *see also Hill v. Seattle First Nat'l Bank*, 827 P.2d 241, 246 (Utah 1992) ("[A]ny rationale for affirming a decision must find support in the record.").

¶ 10 The State argues that there is an "alternative grounds continuum," marked at one end by cases readily affirmed as a matter of law based on the record, and at the other end by cases where "neither affirmance or remand for further fact-finding is justified because the alternative grounds for affirmance are (1) inadequately briefed or (2) clearly rebutted in the record." According to the State, this case falls into a middle ground, where the alternative ground for affirmance, while apparent on the record, requires further development by the trial court before it may be sustained. When the issue is highly fact sensitive, argues the State, it is appropriate for an appellate court to remand for further factual findings.

¶ 11 However, none of the cases cited by the State deal with an alternative ground for affirmance, raised for the first time on appeal, after a trial court has entered a judgment and sentence in a criminal case. Nor could we find any authority for the proposition that the State, after having had one opportunity to establish the admissibility of

evidence in the face of a Fourth Amendment challenge, is entitled to a remand to put on new evidence under a new theory of admissibility. In fact, we have previously held that when the State has the burden of proof and the record on appeal fails to sustain any theory of admissibility, the State "is not entitled to a remand to put on new evidence." *State v. Hodson,* 907 P.2d 1155, 1159 (Utah 1995); *see also State v. Case,* 884 P.2d 1274, 1278–79 (Utah Ct.App.1994); *State v. Gutierrez,* 864 P.2d 894, 897, 903 (Utah Ct.App. 1993). We note that it is not uncommon for Utah's appellate courts to take such a position. There are a number of criminal cases in Utah where the denial of a motion to suppress is challenged on appeal, the State presents an alternative ground for affirmance, and the appellate court refuses to remand and instead decides the case on the record before it. *Hodson,* 907 P.2d at 1159–60; *State v. Montoya,* 937 P.2d 145, 149–50 (Utah Ct.App.1997); *State v. Wells,* 928 P.2d 386, 391–92 (Utah Ct.App.1996); *Case,* 884 P.2d at 1278–79; *Gutierrez,* 864 P.2d at 903. We believe this to be the proper approach in such cases, and we conclude that the court of appeals erred in remanding for what could potentially result in factual findings based on new evidence.

## III. INEVITABLE DISCOVERY

¶ 12 On cross-petition, the State argues that remand is unnecessary in this case because there is compelling evidence in the record that the heroin inevitably would have been discovered even without the illegal detention. Therefore, the trial court's denial of the motion to suppress should be affirmed on the alternative ground that the inevitable discovery exception to the exclusionary rule applies.

¶ 13 The exclusionary rule prohibits the use at trial of evidence, both primary and derivative (the "fruit of unlawful police conduct"), obtained in violation of an individual's constitutional and statutory rights. *Nix v. Williams,* 467 U.S. 431, 442–43, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Courts view the exclusionary rule as a necessary deterrent to unlawful police behavior, one which prevents the police from benefitting from their illegalities. However, the harsh consequences of this rule—excluding relevant evidence of illegal activity at trial—are tempered somewhat by the exceptions to the exclusionary rule. The exceptions allow prosecutors to use the challenged evidence at trial when the "taint" of illegality is sufficiently cleansed. *See* 5 Wayne R. LaFave, *Search & Seizure* § 11.4 (3d ed.1996). For example, the independent source doctrine admits challenged evidence at trial if it was discovered through independent and lawful activity—if there is, in essence, an untainted version of the evidence. This exception "teaches us that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse,* position that they would have been in if no police error or misconduct had occurred." *Nix,* 467 U.S. at 443, 104 S.Ct. 2501.

¶ 14 The inevitable discovery doctrine at issue in this case is similar to the independent source doctrine; it enables courts to look to the facts and circumstances surrounding the discovery of the tainted evidence and asks whether the police would have discovered the evidence despite the illegality. "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale has so little basis that the evidence should be received." *Nix,* 467 U.S. at 444, 104 S.Ct. 2501. *See also James,* 2000 UT 80 at ¶ 16, 13 P.3d 576. "The inevitable discovery doctrine, with its distinct requirements, is in reality an extrapolation from the independent source doctrine: *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." *Murray v. United States,* 487 U.S. 533, 539, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).

¶ 15 Some jurisdictions require that there be an entirely separate, ongoing investigation before applying the inevitable discovery doctrine. *See, e.g., United States v. Lamas,* 930 F.2d 1099, 1102 (5th Cir.1991); *United States v. Hernandez–Cano,* 808 F.2d 779, 783–84 (11th Cir.1987). In *James,* however, this

court held that "an entirely independent, alternate, intervening, appreciably attenuated investigation aside from the tainted investigation" is not required to prove inevitable discovery. *James*, 2000 UT 80 at ¶¶ 15–16, 13 P.3d 576 (quotations omitted). Other jurisdictions similarly have held that a compelling set of facts, establishing that some other lawful means of investigation *would* have led to discovery, is sufficient. *See, e.g., United States v. Larsen*, 127 F.3d 984, 986 (10th Cir.1997); *United States v. Kennedy*, 61 F.3d 494, 497–99, 1995 FED App. 0237P (6th Cir.); *United States v. Thomas*, 955 F.2d 207, 210–11 (4th Cir.1992).

> There will be instances where, based on the historical facts, inevitability is demonstrated in such a compelling way that operation of the exclusionary rule is a mechanical and entirely unrealistic bar, preventing the trier of fact from learning what would have come to light in any case. In such cases, the inevitable discovery doctrine will permit introduction of the evidence, whether or not two independent investigations were in progress.

*United States v. Boatwright*, 822 F.2d 862, 864 (9th Cir.1987). In other words, we are looking for "the hypothetical independent source," regardless of whether it existed before or after the misconduct. *United States v. Cherry*, 759 F.2d 1196, 1206 (5th Cir.1985).

[9, 10] ¶ 16 A crucial element of inevitable discovery is independence; there must be some "independent basis for discovery," *Boatwright*, 822 F.2d at 865, and "the investigation that inevitably would have led to the evidence [must] be independent of the constitutional violation," *Larsen*, 127 F.3d at 987. Thus, "the fact or likelihood that makes the discovery inevitable [must] arise from circumstances other than those disclosed by the illegal search itself." *Boatwright*, 822 F.2d at 864–65. For courts confidently to predict what would have occurred, but did not actually occur, there must be persuasive evidence of events or circumstances apart from those resulting in illegal police activity that would have inevitably led to discovery.

¶ 17 Routine or standard police procedures are often a compelling and reliable foundation for inevitable discovery, even if not part of a separate, concurrent investigation. For example, police searches that would occur after the evidence is legally in their custody, such as routine inventory searches of vehicles impounded after the driver is arrested, are often persuasive evidence of potential independent sources of discovery. *See, e.g., United States v. Seals*, 987 F.2d 1102, 1107–08 (5th Cir.1993); *United States v. Horn*, 970 F.2d 728, 732 (10th Cir.1992). In the more difficult cases, the court must determine whether a single, ongoing investigation would have developed an independent, legal avenue for discovery of the evidence in question. *See, e.g., Kennedy*, 61 F.3d at 500–01 (holding that private search of luggage by airline was inevitable); *United States v. Warren*, 997 F.Supp. 1188, 1195 (E.D.Wis.1998) (holding that there was no evidence that luggage would have been investigated absent the illegal search); *Boatwright*, 822 F.2d at 865 (holding that independent basis for discovery of unlawfully seized weapons was not established); *Thomas*, 955 F.2d at 211 (holding that the illegal search itself was the only possible source of evidence).

¶ 18 In *Boatwright*, officers conducting a routine probation investigation unlawfully searched a building in close proximity to the probationer's and discovered two shotguns that led to the conviction of Rickie, the probationer's brother. *Boatwright*, 822 F.2d at 863. A later, lawful search of the probationer's residence revealed evidence that, according to the testimony of a DEA agent, would have resulted in officers obtaining a search warrant for Rickie's residence. *Id.* at 864. The court did not find this argument compelling, and held that there was "nothing outside the unlawful search itself that points to the inevitable discovery of weapons in control of [Rickie]." *Id.* at 865. The court noted that "as a factual matter, the assumption that the officers would have found Rickie with the shotguns after searching the principal residence, detaining the probationer Rocky, and waiting for a hypothetical warrant, is most unrealistic. Rickie would not have waited patiently beside his weapons for an agent to arrive with a warrant." *Id.; see also Thomas*, 955 F.2d at 211 (holding that government failed to prove inevitable discovery because "the bank money found in the illegal search changed the whole nature of the investigation that followed"); *Proferes v. State*, 116 Nev.

1136, 13 P.3d 955, 959 (2000) (holding that although police could have performed warrants check and arrested defendant on outstanding warrant, they failed to follow proper police procedure and "discovery of the controlled substance would not have been made independent of the [illegal] seizure and [defendant's] unwarned response to the officer's question").

¶ 19 In the case at hand, there was only one ongoing investigation that led to the arrest and search of ·Topanotes and the discovery of the heroin. The State's argument requires us to find that the chain of events that did occur would have occurred in exactly the same manner had Topanotes not been unlawfully detained. There are at least two serious flaws in the State's position. First, the argument that " '[i]f we hadn't done it wrong, we would have done it right,' " *Thomas,* 955 F.2d at 210, is far from compelling. Reasoning that, because a warrants check could have been performed *without* retaining Topanotes' identification, the police should not be punished for performing the warrants check *while* detaining Topanotes misses the point. Allowing the evidence in this situation would provide no deterrent at all to future unlawful detentions. There must be some other circumstance, something outside the warrants check performed contemporaneously with the illegal detention, supporting inevitable discovery "to prevent the inevitable discovery exception from swallowing the exclusionary rule." *Id.* at 211.

¶ 20 The second flaw is found in the State's argument that, because Topanotes was cooperative during the unlawful investigatory stop that did occur, she would have been equally cooperative during the hypothetical, legal investigatory stop that would have occurred. Cases that rely upon individual behavior as a crucial link in the inevitable discovery chain, particularly when that behavior is heavily influenced by the illegality that did occur, rarely sustain an inevitable discovery theory. *See, e.g., Thomas,* 955 F.2d at 211 (suspect cooperated and consented to search only after learning that police entered and searched the room, thus illegal search tainted the suspect's involvement); *United States v. Ramirez–Sandoval,* 872 F.2d 1392, 1400 (9th Cir.1989) (no evidence that police would have asked same questions of individuals during investigatory stop if they had not discovered list of names through illegal search); *State v. Ellwood,* 52 Wash.App. 70, 757 P.2d 547, 550 (1988) ("It was not simply Ellwood's *name,* however, but his *coerced continued presence* at the scene, that led to the seizure of the cocaine.... One can only speculate as to whether Ellwood would still have had the drugs in his possession had Detective Deckard allowed him to leave, and then, upon learning of the outstanding warrant, found and arrested him."). We find "most unrealistic" the assumption that Topanotes would have waited for the police to check for warrants and arrest her with heroin in her possession even if she had not been unlawfully detained.

¶ 21 While the situation *could* have developed in the manner hypothesized by the State, we are not persuaded that it *would* have led to legal discovery of the evidence in question. The State offers no other compelling scenario or hypothetical independent source for discovery of the evidence in question. Thus, we hold that the evidence is not admissible under the inevitable discovery exception to the exclusionary rule.

## CONCLUSION

¶ 22 The court of appeals erred when it remanded to the trial court for new evidence on the issue of inevitable discovery. Alternative grounds for affirmance that are raised for the first time on appeal must be supported and sustained by the record and the factual findings of the trial court. Based on the record before us, we find that the inevitable discovery exception to the exclusionary rule cannot be sustained, and that, therefore, the evidence in this case should have been suppressed. We vacate the court of appeals' remand order and reverse the trial court's denial of Topanotes' motion to suppress. We remand to the trial court for proceedings consistent with this opinion.

¶ 23 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice PARRISH, and Judge NEHRING concur in Justice WILKINS' opinion.

¶ 24 Having disqualified himself, Justice RUSSON did not participate herein; Third District Judge RONALD E. NEHRING sat.